# STATE OF MICHIGAN

# COURT OF APPEALS

JULIE ANN DOYLE,

Plaintiff-Appellant,

v

JOSEPH D. DOYLE,

Defendant-Appellee.

UNPUBLISHED
September 5, 2017

No. 332912
Mecosta Circuit Court
LC No. 14-022145-DM

Before: BOONSTRA, P.J., and RONAYNE KRAUSE and SWARTZLE, JJ.

PER CURIAM.

Following a four-day bench trial, the lower court issued a judgment of divorce that included a determination as to the division of marital property. Plaintiff appeals as of right, challenging that determination. We affirm in part and remand for further proceedings consistent with this opinion.

## I. FACTS

The parties were married in 1990 and separated in 2014. Two children were born during the marriage who were minors at the time of the trial. Plaintiff worked as a schoolteacher during the marriage and at the time of the parties' separation. Defendant purchased a business from his father in 2010, Doyle Forest Products, a lumbering and timbering company, where he worked at the time of trial. Prior to trial, the parties stipulated to the division of most of their personal and real property: defendant received his retirement accounts, his life insurance policy, the marital home, and most of the parties' personal property, while plaintiff received her retirement accounts and her life insurance policy. The majority of the trial proceedings focused on the value of defendant's business, and the valuation process and opinion of the certified public accountant jointly hired by the parties to determine the business's value for purposes of the divorce. The parties' expert, Paul Murray, valued defendant's business at roughly $513,000, using the "income approach," based on the financial data provided by the business. The income approach to business valuation, also known as the capitalization of income method, "is based on the premise that there is a relation between the income a property can earn and the value of that property." *Northwoods Apartments v Royal Oak*, 98 Mich App 721, 725; 296 NW2d 639 (1980). Murray testified that he relied on the income approach because he was "mostly" confident in the validity of the business's sales records, and was able to form his opinion of valuation based on these records and other information provided by the parties. However, Murray also testified that

-1-

the records provided by Doyle Forest Products "were a disaster" and in "bad shape," and that the business's recordkeeping appeared to be "negligent" in some respects.

The trial court rejected Murray's valuation, and determined that the value of the business was $69,364. While the court did not offer its own valuation analysis, it pointed out what it regarded to be four "flaws" in Murray's valuation process that resulted in a higher value for the business than the court believed was accurate. Although the court did not indicate that it was guided by Murray's analysis in any way, Murray testified during cross-examination that the total value of the business would fall to $69,364, if he subtracted the value of certain "excess" and "excess non-operating assets" from the total value of the company. Additionally, defendant had his own expert, accountant Jay Thiebaut, whom defendant failed to present despite repeatedly informing the court of his intention to call him.

## II. BUSINESS VALUATION

Plaintiff argues that the trial court abused its discretion by rejecting Murray's valuation of approximately $513,000, and instead concluding that Doyle Forest Products was worth $69,364. Because the court rejected Murray's opinion of value based on its finding of four "flaws" in his valuation process, we will address each of these "flaws" in turn.

1.      Unreported cash income to company. The trial court found that defendant was more credible than plaintiff with respect to the amount of annual unreported cash income to the company. This Court would tend to defer to the trial court's credibility determination; but, with that said, we do not believe this issue has any practical import. The expert estimated that the company had approximately $2,000,000, in annual sales (while also assuming $27,500, in annual unreported cash income), so if the trial court is correct, then the annual sales should be approximately $1,987,500, ($2,000,000 minus the difference between $27,500 and $15,000), but if plaintiff is correct, then the annual sales should be approximately $2,012,500 ($2,000,000 plus the difference between $40,000 and $27,500). Even assuming that the expert's net profit rate of 4.8% is reasonable, the difference of either approach from the expert's approach would be approximately $600, in annual net profits. Based on annual sales around $2,000,000, with net profits around $96,000, adding or subtracting $600, in net profits, and then discounting over a number of years, would result in changing the valuation of the company by a marginal amount. The evaluation of this flaw really does make a difference to the valuation.

With that said, even though the trial court said that it accounted for this "flaw" by crediting defendant's testimony of $15,000, annual unreported cash income versus the expert's ($27,500) or plaintiff's ($40,000), the trial court did not actually take this change into account, as the valuation the trial court came up with was the precise valuation calculated at trial by the expert with two adjustments that had nothing to do with unreported cash income, as indicated below (in flaw #4).

Therefore, the trial court did not err in crediting defendant's testimony, however the trial court did clearly err by either (i) failing to account for the difference somewhere in its calculation, or (ii) failing to state in its opinion that the matter had no practical impact on valuation, so any dispute over the cash could be ignored for purposes of valuation. On remand, the trial court must make this determination.

2.      Profit rate.  The trial court again sided with defendant on the net profit rate, agreeing that a net profit rate of -4.45% should be used, rather than the expert's industry average net profit rate of +4.8%.  However, under the income-approach of valuing a company, one cannot use an overall negative net profit rate for all years and come up with a positive valuation of a company without something else occurring.  Basically, if a company has net losses of money year after year after year after year (i.e., has an overall negative net profit rate for all years), then there is no mathematical way to add up negative numbers and come up with a positive number.  At oral argument, defendant's counsel was correct in noting that companies like Amazon and Google had losses in their early years, but, crucially, at some point a company needs to start making a net profit (or at least be expected to start making a net profit) for the company to have a positive valuation under the income approach.  Here, it may be correct that a negative profit rate existed in 2015 or 2016, and maybe defendant expects to continue to lose money, but at some point the company must be expected to start making an overall positive net profit for the company to have any positive value under the income approach.

It seems incongruous for the trial court to adopt the -4.45% net profit rate, use the income approach, and still come up with a positive value for the company.  The only way this could make sense is if there is something else going on, e.g., a positive profit rate is assumed in 3-4 years, some assets appreciate and are sold off with the net proceeds treated as income, etc.  The trial court did not explain how it used a negative net profit rate and still arrived at a positive value for the company under the income approach, and this was error.

3.      Non-operating assets.  The expert concluded that defendant had 5 non-operating assets (real property; a Tahoe; a Hyundai; a Timberjack; and a truck), while defendant testified that he used 3 of those assets for the company and so only had 2 non-operating assets (real property; a Tahoe).  The trial court's credibility determination was not error, in light of the expert's admission that he never visited the company's worksite.

4.      Excess-operating fixed assets.  The expert believed that the company had 23.89% more operating fixed assets than it needed in comparison to the national average (74.59% versus 50.70%).  Defendant countered, though, that his company did not have excess operating fixed assets; instead, his company engaged in a wider variety of activities to stay in business in a tough local market, etc.  Again, given that the expert did not visit the work site, it is hard to question the trial court's credibility determination on this matter.

Quite simply, if the trial court had simply agreed with defendant as to #3 and #4---i.e., that the company only had 2 non-operating assets and that the company did not have excess operating fixed assets---then the trial court's valuation of $69,364, makes perfect sense, as that is the precise figure that the expert testified would result from the expert's original valuation of $512,685, minus $95,374, (non-operating asset flaw) and minus $347,947, (excess-operating fixed assets flaw).  However, this valuation assumes (i) the expert's original unreported cash income of $27,500, and (ii) a positive profit rate of 4.8%.  In other words, by arriving at $69,364, it is mathematically impossible for the trial court to have adjusted for all 4 of the flaws it identified.

Accordingly, we remand for an explanation on the record as to how the court arrived at its determination of value and how its identification and consideration of the "flaws" it found in Murray's valuation process affected this determination.

As so aptly stated by plaintiff, a review of the entire record demonstrates there was no basis for the trial court to place a $69,364, value on a business the parties' valued at $1.9 million and purchased for $1.3 million five years earlier, and which a qualified expert valued at $513,000 using well-accepted valuation methods.

### III.  BALANCING THE MARITAL ESTATE

Plaintiff argues next that the court's low valuation of the business "skewed the entire property division," resulting in the court's inequitable order that plaintiff pay defendant $81,017 in cash.  Plaintiff's settlement from the property division consisted solely of her retirement accounts and life insurance policy, which were worth $600,366.  Defendant received his business, the marital home, and other property worth $519,356.  Although the parties stipulated to this division prior to trial, plaintiff argues that Murray's valuation of the business was accurate, while the court's was unreasonably low.  We agree with plaintiff that the court's cash award to defendant was not equitable, that the trial court's finding as to the valuation of the business was in error (as explained above) and both were an abuse of its discretion.

Before attempting to balance the marital estate, the trial court noted that the plaintiff's settlement was worth $600,366, and the defendant's was worth $519,356 (and this reflected the trial court's belief that the company was worth $69,364).

Then, it appears that the trial court attempted to balance the values of the parties' settlements by ordering the plaintiff to pay $81,017, which is quite close to $600,366 minus $519,356 (but which actually equals $81,010).  Assuming $81,017, is the correct difference between the parties' settlements, the trial court appears to have erred because all it did was shift the imbalance from the plaintiff's favor to the defendant's favor.  To understand this, consider the following:

a)      Before the balancing, the plaintiff's settlement was worth $600,366, and the defendant's was worth $519,356.  After the trial court's award of $81,017, the plaintiff's settlement was worth $519,349 (i.e., $600,366 minus $81,017), and the defendant's was worth $600,371 (i.e., $519,356 plus $81,017).

b)      To balance the values, the trial court should take the difference between the original settlement values ($81,010), divide that difference in half, i.e., $81,010 / 2 = $40,505, and award the defendant that amount.  Then, after this hypothetical award, the plaintiff's settlement would be worth $600,366 minus $40,505 = $559,861, and the defendant's settlement would be worth $519,356 plus $41,050 = $559,861.

Because the trial court's calculation of the figure of $600,371, did not explain how it arrived at an award of $81,017, and this Court cannot assume that the award was made to equal the settlement values (because the award does not, in fact, do that), we remand for the trial court to explain the basis for the award.  Obviously, to equalize the settlement values, the award should be the difference divided by 2.

-4-

Keeping in mind that in *Byington v Byington*, 224 Mich App 103, 114-115; 568 NW2d 141 (1997) (citation omitted), we held that in a property division upon divorce, "[e]ach spouse need not receive a mathematically equal share, but significant departures from congruence must be explained clearly by the court." Similarly, our Supreme Court stated in *Sparks v Sparks*, 440 Mich 141, 159; 485 NW2d 893 (1992), that a property division need not be equal in order to be equitable. In *Sparks*, the Court listed several factors to be considered by a trial court in dividing the marital estate, including: (1) the duration of the marriage; (2) each party's contribution to the marital estate; (3) each party's station in life; (4) each party's age; (5) each party's earning ability; (6) necessities and circumstances of the parties; (7) each party's health; and (8) each party's fault or past misconduct. See *id.* at 159-160. The trial court properly discussed these factors, although it is not clear from the court's opinion how its findings on the factors affected its decision.

Pursuant to the *Sparks* factors, the trial court found that the parties' marriage was long-term (25 years); that each party had contributed to the marital estate; that the "parties have enjoyed an upper-middle class lifestyle and shall continue to do so even after a division of the assets in this case"; that the parties were both in their mid- to late 40s, did not have significant health issues and did not intend to stop working in the "near future"; that both parties had sufficient income to support themselves "for now"; that both parties were to receive "a sizable property settlement and both have employment that will allow them more than the basics in life"; and that neither party was apparently at fault in the breakdown of the marriage. Despite these findings, however, the court concluded that plaintiff owed defendant $81,017.

The trial court did not explain its decision to order the award other than by stating that based on its "determination of awards and values, . . . [plaintiff] would owe [defendant] $81,017.00." This explanation was not sufficient to indicate why defendant was entitled to the award. Based on the record, it appears that the trial court was trying to achieve mathematical equality in the property division by ordering plaintiff to pay defendant $81,017. However, this was not required to achieve equity. *Sparks*, 440 Mich at 159. The court found that both parties were employed in positions that would enable them to support themselves and enjoy an "upper-middle class" lifestyle; thus, defendant did not "need" $81,000 in order to support himself. Moreover, because the court's valuation of the business was based on findings of fact that were clearly erroneous, plaintiff should not be required to pay defendant in order to make their property divisions equal based on the trial court's business valuation finding, and she is entitled to a remand on this issue because the court's findings of fact do not support its order.

## IV. SPOUSAL SUPPORT

Plaintiff argues that the court's valuation of Doyle Forest Products deprived her of her equitable share of the marital estate, and that spousal support is now appropriate. We agree with the circuit court that spousal support was not warranted.

In *Loutts v Loutts*, 298 Mich App 21, 32; 826 NW2d 152 (2012), this Court held that "[t]he primary purpose of spousal support is to balance the parties' incomes and needs so that neither party will be impoverished, and spousal support must be based on what is just and reasonable considering the circumstances of the case." Further, MCL 552.23(1) provides:

Upon entry of a judgment of divorce or separate maintenance, if the estate and effects awarded to either party are insufficient for the suitable support and maintenance of either party and any children of the marriage who are committed to the care and custody of either party, the court may also award to either party the part of the real and personal estate of either party and spousal support out of the real and personal estate, to be paid to either party in gross or otherwise as the court considers just and reasonable, after considering the ability of either party to pay and the character and situation of the parties, and all the other circumstances of the case.

In *Myland v Myland*, 290 Mich App 691, 695; 804 NW2d 124 (2010), this Court stated that in deciding whether to award spousal support, the trial court should consider several factors, including:

(1) the past relations and conduct of the parties, (2) the length of the marriage, (3) the abilities of the parties to work, (4) the source and amount of property awarded to the parties, (5) the parties' ages, (6) the abilities of the parties to pay alimony, (7) the present situation of the parties, (8) the needs of the parties, (9) the parties' health, (10) the prior standard of living of the parties and whether either is responsible for the support of others, (11) contributions of the parties to the joint estate, (12) a party's fault in causing the divorce, (13) the effect of cohabitation on a party's financial status, and (14) general principles of equity.

"The trial court should make specific factual findings regarding the factors that are relevant to the particular case." *Loutts*, 298 Mich App at 32.

In the instant case, the trial court made specific findings on the relevant factors set forth in *Myland* in determining that plaintiff was not entitled to spousal support. Plaintiff has not shown that the court's findings on these factors were clearly erroneous. Although the court found that defendant had the ability to pay spousal support, it also found that both parties were relatively young, had good jobs that would enable them to maintain their current lifestyles, and had the ability to work for the foreseeable future. Additionally, the parties had two minor children, and the court noted that defendant was to be assessed child support. Based on these findings, the court did not abuse its discretion in holding that general principles of equity did not support an award of spousal support.

## V. ATTORNEY AND EXPERT FEES

The trial court ordered that each party was to pay for their portion of the business valuation, up to the date of trial, as well as their own attorney fees. The court also ordered that plaintiff was solely responsible for Murray's fee for testifying at trial. The court found that defendant had "clearly indicated . . . that he was not requesting [Murray's] services for Trial and did not agree with his valuation." We agree with the trial court's decision not to award attorney or trial expert fees to either party.

Attorney fees in a divorce action are awarded only as necessary to enable a party to prosecute or defend a suit. *Gates v Gates*, 256 Mich App 420, 438; 664 NW2d 231 (2003). It is

well settled that a party should not be required to invade assets to satisfy attorney fees when the party is relying on the same assets for support. *Id.* Plaintiff does not assert that she was unable to defend the suit or to pursue her appeal without an award of attorney fees, nor does she argue that she was forced to invade the assets she relies on for her support in order to pay her attorney. Rather, plaintiff argues that defendant's conduct contributed to the cost of her attorney, as she "incurred more than $25,000 of attorney fees associated with preparation for, and conduct of, the trial." Additionally, plaintiff notes that the bulk of the trial was devoted to determining the value of Doyle Forest Products. These arguments do not demonstrate that plaintiff was entitled to attorney fees.

Although a trial court does not necessarily abuse its discretion by awarding attorney fees based on the adverse party's conduct, see *Sands v Sands*, 442 Mich 30, 36; 497 NW2d 493 (1993) (holding that it was not inequitable for the circuit court to require the defendant to pay a large portion of the plaintiff's legal fees based on the defendant's "devious and deceptive" conduct preceding and throughout trial), plaintiff has not presented evidence that defendant's bad conduct caused her legal fees to increase in an unwarranted manner. Plaintiff is not entitled to an award of attorney fees simply because the case was expensive and drawn out. The trial court did not abuse its discretion by ordering the parties to pay their own attorney fees.

Regarding the order to pay the full amount of Murray's trial fee, plaintiff notes that the parties jointly engaged Murray as a valuation expert, and that defense counsel spent a full day cross-examining Murray. This is true, however, the expert's report was not given to defendant until the 11th hour and his counsel's cross-examination was not unnecessarily prolonged in light of there being no opportunity to depose the expert before trial.

This is a simple contractual issue. The expert was clearly plaintiff's expert at trial. The expert's engagement agreement delineated between performing the company valuation and trial. Defendant did pay for his half of the company valuation fees. The trial court did not err in not requiring defendant to pay for plaintiff's expert's testimony under the circumstances and engagement agreement/contract.

Affirmed in part, and remanded for proceedings consistent with this opinion. We retain jurisdiction.

/s/ Mark T. Boonstra
/s/ Amy Ronayne Krause
/s/ Brock A. Swartzle

# Court of Appeals, State of Michigan

# ORDER

Julie Ann Doyle v Joseph D. Doyle

Docket No. 332912

LC No. 14-022145-DM

Mark T. Boonstra
Presiding Judge

Amy Ronayne Krause

Brock A. Swartzle
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court. We retain jurisdiction.

Proceedings on remand in this matter shall commence within 21 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded. The proceedings on remand are limited to these issues.

The parties shall promptly file with this Court a copy of all papers filed on remand. Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

/s/ Mark T. Boonstra

September 5, 2017